**Revised August 2, 2002**

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 02-50185

In the Matter of: SARMA GANDY, Debtor.

JAMES GANDY, KARTAR GANDY, HARY GANDY LIMITED PARTNERSHIP, SIGNTECH USA, LTD., KARTAR GANDY LIMITED PARTNERSHIP, and HARY GANDY, Appellants,

VERSUS

SARMA GANDY, Appellee.

Appeal from the United States District Court
For the Western District of Texas

July 22, 2002

Before KING, Chief Judge, PARKER, Circuit Judge, and ELLISON *, District Judge

ELLISON *, District Judge:

This is an appeal from an order denying Appellants' motion to compel arbitration.  Specifically, Appellants, James Gandy, Kartar Gandy, Kartar Gandy Limited Partnership, Hary Gandy, and Hary Gandy Limited Partnership ("Gandys"), seek arbitration of claims asserted against them by Sarma Gandy, who is currently a

debtor in possession ("Debtor") under Chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 1101 *et seq.* (2002). The United States Bankruptcy Court for the Western District of Texas, holding that it had discretion to refuse to order arbitration of core bankruptcy matters, denied the Gandys' motion to compel arbitration and to stay the adversary proceeding pending arbitration. The District Court affirmed. The Gandys now appeal to this court. We affirm.

## Factual and Procedural History

This case evolved from a state court suit brought by the Debtor, prior to her bankruptcy, challenging the specifics of asset liquidation of Signtech USA, Limited ("Signtech"). Signtech was a Texas limited partnership, formed in 1993, that was in the business of making sign components and materials, printing sign faces and other large advertisements, and manufacturing and selling wide-format digital printers used in printing large advertising copy. When Signtech was formed, Debtor acquired a 33% ownership in Signtech as her sole and separate property. The remaining interest in Signtech was owned by Kartar Gandy Limited Partnership ("KGLP"), as owned and controlled by Kartar Gandy, Debtor's father-in-law, and by James Gandy, Debtor's brother-in-law. On October 10, 1997, Debtor

entered into a post-marital agreement whereby Debtor transferred her 33% interest in Signtech to a new limited partnership, Hary Gandy Limited Partnership ("HGLP"). Hary Gandy, Debtor's husband, was HGLP's general partner and 20% owner, and Debtor was a limited partner and 80% owner. After the 1997 transfer, Signtech's ownership interests were distributed among HGLP, James Gandy, KGLP, and Gandy Group, Inc. HGLP, James Gandy, and KGLP were the limited partners and 33% owners, while Gandy Group, Inc. was the general partner and 1% owner.

Debtor's claims center on a series of transactions surrounding and following the 1997 transfer. Debtor alleges that Hary Gandy, motivated by the possibility of an impending divorce from Debtor, procured the transfer of Debtor's 33% ownership interest in Signtech to HGLP in order to secure his control over Signtech. Debtor argues that this enabled Hary Gandy to continue to conceal from Debtor the real value of her ownership interest.[1] After the transfer to HGLP, Hary Gandy also obtained from Debtor an increase from 20% to 20.35% of his ownership interest in HGLP. According to Debtor, Hary Gandy obtained the additional interest to forestall the invocation of a partnership clause permitting replacement of the general partner, with or without cause, upon a vote of 80% of the ownership interests in the partnership.

As Signtech increasingly lost business and fell in debt, it began to sell various of its business components. After these asset sales, Signtech's remaining assets were its building, its

3

digital printer manufacturing business, and its accounts receivable. On April 7, 2000, James Gandy, Hary Gandy (on behalf of HGLP), and Kartar Gandy (on behalf of KGLP) signed a plan of liquidation for Signtech and a series of assignments of Signtech's partnership interests in exchange for Signtech's assets. Effective as of March 1, 2000, the plan of liquidation and the assignments transferred to HGLP ownership of accounts receivable, and to James Gandy and KGLP 33% and 62%, respectively, of the remaining assets of Signtech, except for Signtech's building.[2] Debtor, in consultation with Hary Gandy, had agreed to receive Signtech's accounts receivable as HGLP's share of the distribution upon liquidation. Debtor alleges that, unbeknownst to her, the accounts receivable consisted primarily of uncollectable foreign debts. In contrast, on April 3, 2000, four days before the signing of Signtech's liquidation plan, James Gandy began negotiating with one of Signtech's competitors for the sale of Signtech's digital printer business. The competitor agreed to purchase the digital printer business for $30,000,000.00 on April 17, 2000.

Debtor then sued the individual members of the Gandy family and the partnerships alleging causes of action for breach of fiduciary duty, negligence, fraud, constructive trust, and breach of contract. The Gandys filed a motion to compel arbitration based on arbitration clauses in the parties' partnership agreements.[3] On February 28, 2001, the state court granted the

4

motion and stayed the lawsuit. Debtor filed for bankruptcy that afternoon. The state court suit was subsequently removed to the bankruptcy court as an adversary proceeding. Debtor also filed a new adversary action in bankruptcy court, and then moved to consolidate the second adversary with the previously removed state action. With the Gandys' consent, the bankruptcy court allowed the consolidation of Debtor's claims in the two adversaries into a single complaint—the Third Amended Complaint. The Third Amended Complaint included causes of actions to avoid transfers pursuant to sections 544, 550, and 548 of the Bankruptcy Code, for civil RICO conspiracy, for insider fraud, and to establish alter ego claims and require substantive consolidation. The Gandys filed motions with the bankruptcy court to compel arbitration and for stay of the adversary proceeding pending arbitration. The bankruptcy court denied the motions after finding that Debtor's complaint essentially sought avoidance of fraudulent transfers. The district court affirmed the bankruptcy court's exercise of discretion, holding that Debtor had raised actual core proceedings in her capacity as debtor in possession. Back in the bankruptcy court, Debtor, based on allegations that the Gandys had transferred funds belonging to Debtor's estate to foreign "off-shore" trusts after she sought Chapter 11 protection, successfully obtained a temporary restraining order against the Gandys, except for Hary Gandy and HGLP, prohibiting them from further use of the funds.[4]

The Gandys now timely appeal to this court the denial of the motion to compel arbitration and for stay of the adversary proceeding pending arbitration.

## Discussion

This court's appellate jurisdiction to review the bankruptcy court's refusal to stay an adversary proceeding pending arbitration is founded upon section 16(a)(1)(A) of the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 *et seq.* (2002).[5] Referring to this subsection, this court in *In re National Gypsum*, 118 F.3d 1056, 1061 (5th Cir. 1997), stated that "[a] bankruptcy court's refusal to stay an adversary proceeding pending arbitration, though interlocutory in nature, is nevertheless appealable because of section 16 of the Federal Arbitration Act." *See also Hays & Co. v. Merrill Lynch , Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1151-52 (3d Cir. 1989) (holding that 9 U.S.C. § 16(a) establishes rule of immediate appealability with respect to orders denying motions to compel and to stay arbitration). Thus, under 9 U.S.C. § 16(a)(1)(A) and *National Gypsum*, this court has jurisdiction to hear the appeal from the order of the bankruptcy court refusing to stay Debtor's adversary proceeding pending arbitration.

On appeal, the Gandys argue that the district court erred in refusing to compel Debtor to arbitrate this case under the

arbitration clauses of the partnership agreements for Signtech and HGLP. Whether a bankruptcy court has discretion to deny a motion to stay a bankruptcy proceeding pending arbitration is a question of law that we review *de novo*. *National Gypsum*, 118 F.3d at 1064. We also review *de novo* legal determinations of whether an adversary proceeding in bankruptcy court is "core" under 28 U.S.C. § 157(b). *Id.* at 1062. If we find that the bankruptcy court had discretion to assess whether arbitration would be consistent with the Bankruptcy Code, the exercise of that discretion is reviewable only for abuse. *See In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999).

The Gandys contend that Debtor, as a party to the Signtech and HGLP partnership agreements, had agreed to be bound by the arbitration clauses that appear in identical form in the two agreements. The Gandys contend that the FAA embodies a strong federal policy in favor of arbitration and, therefore, compels the arbitration of this case. The Gandys argue that Debtor, in an effort to avoid arbitration, has "window-dressed" her state law claims and artfully repled them as bankruptcy claims. The Gandys further argue that, even if Debtor could bring her "Bankruptcy Code-based" claims, they lack merit. The bankruptcy and district courts considered and rejected these arguments. The bankruptcy court found, and the district court affirmed, that Debtor's adversary proceeding raised actual core bankruptcy

7

issues including, *inter alia*, issues of avoidance of fraudulent transfers.

The Gandys' argument that the decision of the bankruptcy court contravenes the FAA and the terms of the partnership agreements requires this court to reconcile two important federal statutes: the Federal Arbitration Act and the Bankruptcy Code. The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA directs courts rigorously to enforce agreements to arbitrate, even if a party opposing arbitration is asserting a statutory claim.  *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226-27, 107 S.Ct. 2332, 96 L.Ed 2d 185 (1987).  A court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement.  9 U.S.C. § 3; *id.* at 226, 107 S.Ct. at 2337.  This statutory directive, however, may be overridden by a contrary congressional command.  *McMahon*, 482 U.S. at 226, 107 S.Ct. at 2337.  A party wishing to defeat application of the FAA bears the burden of demonstrating "that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue."  *Id.* at 227, 107 S.Ct. at 2237.

While it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving "core" bankruptcy proceedings under 28 U.S.C. § 157(b),

8

this court has held that a bankruptcy court may decline to stay a proceeding whose underlying nature derives exclusively from the provisions of the Bankruptcy Code. *National Gypsum*, 118 F.3d at 1067. In *National Gypsum*, this court cited with approval the Third Circuit's conclusion in *Hays* that bankruptcy courts generally do not have discretion to decline to stay proceedings involving non-core matters. *Id.* at 1066 (stating that *Hays* makes "eminent sense" and is "universally accepted" with respect to debtor-derivative, non-core matters).[6] A bankruptcy court does possess discretion, however, to refuse to enforce an otherwise applicable arbitration agreement when the underlying nature of a proceeding derives exclusively from the provisions of the Bankruptcy Code and the arbitration of the proceeding conflicts with the purpose of the Code. *Id.* at 1067 (noting *McMahon*, 482 U.S. at 226-27, 107 S.Ct. at 2337-38).

We reasoned in *National Gypsum* that, "at least where the cause of action at issue is not derivative from the debtor's pre-petition legal or equitable rights but rather is derived entirely from federal rights conferred by the Bankruptcy Code," a bankruptcy court retains "significant discretion" to refuse to stay the adversary proceeding and compel arbitration. 118 F.3d at 1069. Such discretion permits the bankruptcy court to assess whether arbitration would be consistent with the purpose of the Code, "including the goal of centralized resolution of purely

9

bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *Id.* We are persuaded that this reasoning governs the disputed issues in this case, and that bankruptcy court rather than arbitration is the appropriate forum.

Debtor advances three causes of action that derive entirely from the federal rights conferred by the Bankruptcy Code. As a debtor in possession, she seeks to exercise a trustee's "strong arm" powers under section 544 of Title 11 to avoid any transfer that an unsecured creditor could have avoided under applicable state law. 11 U.S.C. § 544(b). Debtor also seeks relief under section 548 to avoid any fraudulent transfer of an interest of the debtor that was made within one year of the filing of her bankruptcy petition. 11 U.S.C. § 548. Accordingly, she also claims the remedies available under section 550 to recover such transferred property or interest, or the value thereof, from the transferees or their successors. 11 U.S.C. § 550(a). All of these claims to avoid or recover pre-bankruptcy transfers are "core proceedings" arising under Title 11, pursuant to 28 U.S.C. § 157. These claims are created by the Bankruptcy Code and are not—outside of bankruptcy—available to Debtor. *See In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987) (stating that "a proceeding is core under section 157 if it invokes a substantive right provided

10

by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case"); *see, e.g., Hays*, 885 F.2d at 1155 ("Claims asserted by the trustee under section 544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to assert on their behalf."); *see, e.g., In re Hamilton Taft & Co.*, 176 B.R. 895, 902 n. 4 (Bankr. N.D. Cal. 1995) (noting that section 548 of the Bankruptcy Code creates a federal cause of action for recovery of a fraudulent conveyance).

The Gandys' arguments to the contrary rely on *Trefny v. Bear Stearns Securities Corp.*, 243 B.R. 300 (Bankr. S.D. Tex. 1999). In *Trefny*, a trustee appointed to oversee the liquidation of a debtor-brokerage firm brought an adversary proceeding against a securities firm that served as the debtor's clearing broker. The trustee alleged causes of action under Texas state law, federal civil causes of action based on violations of criminal statutes, and the Bankruptcy Code. *Id.* at 306. The district court found that the trustee was bound by the arbitration agreement between the debtor and the clearing broker and between the debtor's customers and the clearing broker to arbitrate the state-law claims and the claims based on federal criminal statutes. *Id.* at 320. With respect to the bankruptcy claims, the district court found that the trustee did not assert a turnover claim of the debtor's liquidated or undisputed funds under 11 U.S.C. § 542,

11

nor properly plead a fraudulent transfer claim under 11 U.S.C. § 548. *Id.* at 320, 322. The district court reversed the bankruptcy court's order denying the clearing broker's request for a stay pending arbitration.

The reliance by the Gandys on *Trefny*'s analysis of the general avoiding powers of a trustee is misplaced. In *Trefny*, the trustee had not pleaded a proper section 548 claim because he did not allege a transfer of "an interest of the debtor in property" when he sought to avoid transfers of property of the debtor's customers. 243 B.R. at 322. The district court concluded that the trustee was essentially pursuing tort claims of fraud and seeking to recover money or securities lost because of the alleged fraud. *Id.*

In this case, conversely, Debtor is seeking to avoid transfers of her own ownership interests in Signtech or HGLP that she made beginning in October 10, 1997. Assuming the facts to be well pleaded and without evaluating the merits of any claim, we note that the potential avoidance of such transfers is governed by section 544(b), subject to the four-year limitations period for Texas fraudulent transfer actions,[7] and by section 550. Debtor also seeks to avoid transfers made upon the liquidation of Signtech, a transaction made within one year before the commencement of Debtor's bankruptcy case,[8] for which section 548 is also available.[9] Through these causes of action provided by

12

the Bankruptcy Code, Debtor, as a debtor in possession in Chapter 11, is exercising the trustee's "strong arm" powers pursuant to 11 U.S.C. § 1107(a).[10] Unlike the situation in *Trefny*, the transactions alleged to be fraudulent in this case are not subject to the same kind of attack by Debtor outside of bankruptcy. Therefore, assuming the facts to be well pleaded, Debtor asserts bankruptcy causes of actions under sections 544, 548 and 550 that are in essence created by the Bankruptcy Code for the benefit of creditors of the estate. *See National Gypsum*, 118 F.3d at 1068 (citing with approval *In re Statewide Realty Co.*, 159 B.R. 719, 722 (Bankr. D.N.J. 1993) (interpreting *Hays* and distinguishing between actions derived from the debtor and actions created by the Bankruptcy Code)). In this circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith." *Id.*

While some of Debtor's remaining claims do involve her pre-petition legal or equitable rights, the bankruptcy causes of action predominate. The heart of Debtor's complaint concerns the avoidance of fraudulent transfers and implicates non-bankruptcy contractual and tort issues "in only the most peripheral manner." *National Gypsum*, 118 F.3d at 1067. Once Debtor sought the relief afforded by Chapter 11 of the Bankruptcy Code, she became a debtor in possession vested with certain statutory rights that empower her "by virtue of the Bankruptcy Code to deal with [her]

contracts and property in a manner [she] could not have employed absent the bankruptcy filing." *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed 2d 482 (1984).

Appellants' own arguments reinforce the primacy of Debtor's bankruptcy causes of action. Appellants contend that, even if Debtor got far less than her fair share from Singtech and HLGP, she is without remedy because she was represented by counsel and either knew or should have known how to protect her interests. Since Debtor failed so badly in looking out for herself, Appellants seem to argue, she is now without redress. This might well be a correct analysis of Debtor's prospects for recovery on the causes of action she pled in state court: breach of fiduciary duty, negligence, fraud, constructive trust and breach of contract. But Debtor's mistakes, misjudgments, or failings—or those of her counsel—matter little if at all in causes of action brought under 11 U.S.C. §§ 544, 548 or 550. Because claims made pursuant to these sections are creditor-based, the misconduct of the debtor is hardly a complete defense. Indeed, the Bankruptcy Code's creditor-based causes of action, including those incorporated from state law, are often grounded in serious allegations of misconduct by the debtor. *See, e.g.*, *In re Pancake*, 106 F.3d 1242 (5th Cir. 1997); *In re Haber Oil Co., Inc.*, 12 F.3d 426 (5th Cir. 1994); *In re Hayden*, 248 B.R. 519 (Bankr. N.D. Tex. 2000). Thus, the adjudication of Debtor's

14

bankruptcy rights is separate and unrelated to Debtor's pre-petition legal or equitable rights. *See National Gypsum*, 118 F.3d at 1068.

That Debtor's bankruptcy causes of action predominate does not, however, end the analysis. Even when a cause of action is derived entirely from the federal rights conferred by the Bankruptcy Code, the bankruptcy court has discretion to deny enforcement of the arbitration clause only when enforcement would conflict with the purpose or provisions of the Code. *National Gypsum*, 118 F.3d at 1069. On this point, *Trefny* is also of no help to the Gandys. Since the trustee in *Trefny* had not asserted a turnover claim under section 542 that precluded arbitration, nor pleaded a fraudulent transfer claim under section 548, the district court concluded that the trustee's claims did not involve important bankruptcy policies. 243 B.R. at 325. Therefore, under the dictates of *National Gypsum*, the trustee had failed to show that arbitration of his claims would implicate or conflict with the bankruptcy law or policies. *Id.* 324-25.

In this case, not only are Debtor's claims derived from the Bankruptcy Code, their resolution implicates matters central to the purposes and policies of the Bankruptcy Code. We note, first, that Debtor's claims against the Gandys appear to represent very nearly the entirety of Debtor's bankruptcy estate.

Secondly, this dispute intimately implicates a central

15

purpose of the Bankruptcy Code: the expeditious and equitable distribution of the assets of Debtor's estate. According to Debtor's pleadings and uncontroverted arguments before this court, Kartar Gandy and James Gandy have transferred funds that are the proceeds of transfers that are the subject of Debtor's adversary proceeding to foreign "off-shore" grantor trusts.[11] Letters from these foreign trustees claim that they will not honor the jurisdiction of United States courts and will not execute judicial orders requiring the return of the contested funds to the bankruptcy court's jurisdiction. The bankruptcy court has entered a temporary restraining order prohibiting the Gandys, except for Hary Gandy and HGLP, from further use of the funds pending an on-going preliminary injunction hearing. In view of this development, the expertise and power of a bankruptcy court, including service of process, compulsory jurisdiction and contempt, and ancillary jurisdiction with respect to possible foreign proceedings, *see* 11 U.S.C. § 304, seem decidedly preferable to that of even the most experienced arbitrator. The bankruptcy court and the district court acting as one unit have exclusive jurisdiction over all of the property, "wherever located," of the Debtor, and of property of her estate. 28 U.S.C. § 1334(e).

Third, one party, Hary Gandy, already has filed a proof of claim as a lien holder on the Debtor's interest in Signtech.

16

This court has held that filing a proof of claim under bankruptcy law "invokes the special rules of bankruptcy concerning objections to the claim, estimation of the claim for allowance purposes, and the rights of the claimant to vote on the proposed distribution." *Wood,* 825 F.2d at 97. In this sense, "a claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy." *Id.* Although only one of the appellants has filed a proof of claim, the peculiar powers of the bankruptcy court have been invoked. The "nature of the state proceeding [becomes] different from the nature of the proceeding following the filing of a proof of claim." *Id.*

Fourth, Debtor has also asserted claims for substantive consolidation of the assets and liabilities of certain nominally distinct entities. While we recognize that substantive consolidation is an extreme and unusual remedy[12] and intimate no view on the merits of Debtor's claims, we note that substantive consolidation is a remedy available to a bankruptcy court that may be out of reach in arbitration.

Although it is technically possible that the Debtor's case be divided and some claims be sent to arbitration, *see, e.g., Hays*, 885 F.3d at 1154-55, this approach here would be of disservice to the parties and defeat the purposes of the Bankruptcy Code. *See generally* Mette H. Kurth, Comment, *An Unstoppable Mandate and an Immovable Policy: The Arbitration Act*

17

*and the Bankruptcy Code Collide*, 43 U.C.L.A. L. REV. 999, 1034 (1996) (recommending that judicial discretion be exercised to bring about the most efficient resolution of a case). Parallel proceedings would be wasteful and inefficient, and potentially could yield different results and subject parties to dichotomous obligations. *See National Gypsum*, 118 F.3d at 1069 n. 21 (stating that efficiency concerns may be legitimate considerations in the bankruptcy context, where efficient resolution of claims and conservation of the bankruptcy estate assets are integral purposes of the Bankruptcy Code). While consideration of bifurcated proceedings has been found not to be substantial enough to override the federal policy favoring arbitration with respect to derivative, non-core matters, *see, e.g.*, *Hays*, 885 F.2d at 1158-59, this concern, in the context of causes of action derived from the Bankruptcy Code, could present the type of conflict with the purposes and provisions of the Bankruptcy Code that may override the FAA's statutory directive of enforcement of arbitration agreements. *See National Gypsum*, 118 F.3d at 1068 (alluding to *McMahon*, 482 U.S. at 226-27). Moreover, as already noted, Appellants' proffered defenses to Debtor's causes of action suggest strongly that the non-bankruptcy causes of action are inconsequential relative to the bankruptcy causes of action. *See id.* (stating that where a core proceeding involves adjudication of federal bankruptcy rights

18

wholly divorced from inherited pre-petition state law claims, the importance of the federal bankruptcy forum is at its zenith).

Some of the purposes of the Code we mentioned in *National Gypsum* as potentially conflicting with the Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders. 118 F.3d at 1069. In this Debtor's case, each of these concerns is tangible and justifies the federal bankruptcy forum provided by the Code.[13]

Accordingly, we find that the bankruptcy court possessed discretion to refuse enforcement of the arbitration provision in the Signtech and HGLP partnership agreements, and that the bankruptcy court did not abuse its discretion in denying, and the district did not err in affirming the denial of, the motions to compel arbitration and for stay pending arbitration.


AFFIRMED.

1.  Debtor alleges that a later rescission agreement, executed by Debtor and Hary Gandy, reconveyed to her all of her 33% interest in Signtech.  Debtor claims that she, not HGLP, was the owner of 33% of Signtech when it liquidated in March of 2000.  The Gandys dispute any such rescission and maintain that HGLP owned 33% of Signtech at its liquidation.  Irrespective of whether Debtor or HGLP owned 33% of Signtech, Debtor's pleadings allege sufficient facts, for instance, those related to the 1997 transfer or, in the alternative, the transfer of Debtor's ownership interest in HGLP, to raise avoidance causes of action in the bankruptcy proceeding.

2.  Eventually, KGLP took Signtech's building in exchange for increasing James Gandy's ownership in the other assets to 49%.

3.  The partnership agreements for Signtech and HGLP contain this identical broad arbitration clause:

> The Parties agree that any controversy or claim arising out of or relating to this Agreement, or any dispute arising out of the interpretation or application of this Agreement, which the parties hereto are unable to resolve, shall be finally resolved and settled exclusively by arbitration in San Antonio, Texas[,] by a single arbitrator under the American Arbitration Association's Commercial Arbitration Rules then in effect and in accordance with the substantive laws of the State of Texas.  The parties each recognize and consent to the jurisdiction over each of them by the courts of the State of Texas.  The award of the arbitrator shall be final and binding upon the parties and non-appealable, and judgment may be entered upon such award by any court of competent jurisdiction.

*See* Signtech Partnership Agreement section 14.15; HGLP Partnership Agreement section 14.16.

4.  This restraining order is continued through and until conclusion of an on-going preliminary injunction hearing.

5.  9 U.S.C. § 16(a)(1)(A) provides:

> "(a) An appeal may be taken from —
> (1) an order —

                    (A) refusing a stay of any action under section 3
                    of this title; . . ..


6.   In *Hays*, the Third Circuit reasoned that claims derivative of
the debtor are not excused from the clear congressional and Supreme
Court mandate that parties to an arbitration agreement must be
bound by it unless the party opposing arbitration can show that
"the text, legislative history, or purpose of the Bankruptcy Code
conflicts with the enforcement of the arbitration clause."   885
F.2d at 1156.  *See In re Crysen/Montenay Energy Co.*, 226 F.3d 160
(2nd Cir. 2000) (noting the general acceptance of *Hays*'s holding
that district courts must stay non-core proceedings in favor of
arbitration)*; see also In re Gurga*, 176 B.R. 196, 197 (B.A.P. 9th
Cir. 1994) (holding that a bankruptcy court must enforce an
agreement to arbitrate a claim that is non-core).


7.  Debtor filed for bankruptcy on February 28, 2001.  Her earliest
avoidance claim relates back to October of 1997.  She, therefore,
has brought her claims within the four-year statute of limitations
for Texas fraudulent transfer actions.  *See* TEX. BUS. & COM. CODE ANN.
§ 24.005; TEX. CIV. PRAC. & REM. CODE ANN. § 16.004.


8.   The Gandys signed the Signtech liquidation plan on April 7,
2000, but made it effective as of March 1, 2000.   Signtech's
liquidation occurred within one year prior to Debtor filing her
bankruptcy petition on February 28, 2001.


9.  The Gandys argue that Debtor, as a minority partner of Signtech
and HGLP, cannot challenge the transfers made by Signtech upon its
liquidation.  Regardless of whether Debtor directly or indirectly
through HGLP owned an interest in Signtech, the Gandys argue that
Debtor's limited partner status means that she has no interest in
specific partnership property under section 7.01 of the Texas
Revised Limited Partnership Act.  While the Gandys have correctly
quoted the nature of partnership interests involved, this section
does not prevent remedies for a distribution that a partner is
entitled to receive.   Section 6.06 of the Revised Limited
Partnership Act provides that:

        Subject to Sections 6.07 [prohibition and liability for
        excessive   distributions]   and   8.05   [priorities   in
        disposition of assets] of this Act, at the time that a
        partner becomes entitled to receive a distribution, with
        respect to the distribution, that partner has the status
        of and is entitled to all remedies available to a
        creditor of the limited partnership.


21

Section 6.06 makes Debtor, a partner, into a quasi-creditor of the partnership for a distribution that she is entitled to receive. *See* TEX. REV. LIMITED PARTNERSHIP ACT § 6.06, *Source and Commentary* (2001). As such, Debtor's estate is a creditor vested with the same rights and remedies as any creditor. Debtor's estate, then, is a creditor for the purpose of raising a fraudulent transfer cause of action under 11 U.S.C. § 548 with respect to the distribution of Signtech's assets upon its liquidation. Appellants have, in a post-argument submission, contended that Signtech was in the process of "winding up" and that the rights of limited partners would be governed by section 8.05 rather than section 6.06. The record does not contain sufficient evidence for this court to conclude that Signtech was being wound up. Section 8.01 equates winding up with dissolution. Signtech appears simply to have been in the process of liquidating some of its assets. *See* Appellants' Br. at 6 ("Prior to the liquidation of its assets in 2000 . . ..."). Moreover, Appellants do not cite any authority for the proposition that a limited partner could not become a creditor if she did not receive what was due her in a winding up.

10. The right of the trustee to commence an avoidance action is extended to a debtor in possession pursuant to 11 U.S.C. § 1107(a), which gives the debtor in possession "all of the rights . . . and powers" of a trustee. *See* 5 L. KING, COLLIER ON BANKRUPTCY ¶ 544.02 at 544-4 n. 1, ¶ 548.01[1] at 548-7 (15th ed. rev. 2002).

11. Debtor filed her Fourth Amended Complaint subsequent to the discovery of this conduct.

12. *See Eastgroup Properties v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991) (stating that courts have noted that substantial consolidation be "used sparingly").

13. Additionally, we note that if, as happens with many multi-party disputes involving a debtor in possession, a global settlement agreement among the parties is reached, the matter would be before the bankruptcy court anyway under Bankruptcy Rule 9019.